OPINION OF THE COURT
Bernard Klieger, J.
Benjamin Denmark, who is in the business of providing limousine service, is suing the New York Telephone Company for wrongfully disconnecting his business phone which he claims resulted in a loss of earnings.
The facts of the case are not in dispute. Denmark sublets part of an office leased and occupied by York Limousine. On May 25, 1978, Mundola, an installation foreman for the New York Telephone Company, was sent to the premises for an inspection in preparation for work that was to be done the next day for York. While conducting his survey, he noticed a "dusty” telephone in the corner belonging to Denmark. York, alleging that Denmark "hadn’t been around”, requested that the telephone be disconnected.
Mundola contacted the defendant’s business office and reported the facts as told to him by York to a business representative. The representative informed his supervisor of the request to disconnect; and the supervisor, after checking a record of Denmark’s payments, authorized the disconnect.
Significantly, the records which formed the basis of the determination to terminate service indicated that a payment had been made on May 4, 1978.
Denmark does not dispute the facts. The area of contention is whether the phone had been abandoned or, more importantly, whether adequate steps were taken to determine whether the phone was actually abandoned.
Telephone service, one time a luxury, has today become a necessity. At the heart of life and livelihood is our communication network through which all our other resources can be mobilized and information exchanged. It is because of the public’s need for reliable and efficient telecommunications *207 service that telephone companies have been given a quasi-public status, affected with the responsibility of acting in the public interest and even equated to common carriers. (Freschen v Western Union Tel. Co., 115 Misc 289.)
Axiomatic is the principle that the telephone company is bound to furnish service to all who pay its proper charges and obey its reasonable regulations. (Matter of Figori v New York Tel. Co., 32 AD2d 434.) The court recognizes that a public utility may terminate service under extenuating circumstances. Those circumstances, in view of the possible devastating consequences of service termination, must be carefully defined.
The two situations in which service may be discontinued, disregarding illegal use, are nonpayment and abandonment. The regulations which deal with these situations set forth conditions precedent to the termination or suspension of services.
In brief the regulations governing nonpayment require that notice must be given prior to termination. Further, payments must be posted to accounts rapidly to prevent possible wrongful disconnections; accounts must be verified as to delinquency; and termination may not occur on any day on which the business office is closed.
As the regulations relate to abandoned facilities, 16 NYCRR 631.4 states that no telephone corporation shall terminate service "unless such corporation shall first determine by an on-premises inspection, or such other means as are necessary, that such facilities have in fact been abandoned”.
The telephone company did not act in accordance with its regulations. Defendant admits that the last payment it received was for the March 22 bill on May 4. Although on May 25 it had not received payment for the May 22 bill service termination under a theory of nonpayment was not justified. Not only is a bill outstanding for three days insufficient to constitute nonpayment, but assuming arguendo that it was, defendant did not put plaintiff on notice of its intention to discontinue service. No notices of delinquency were sent and, moreover, from the testimony adduced at trial it is evident that no such notices were contemplated at that time.
The telephone company further argued that the telephone in question had been abandoned. Denmark testified, however, that his phone was crucial to his business even when he was not at the premises. The defendant furnished Denmark a *208 service at an additional monthly charge, which its own records should reveal, whereby calls made to Denmark at his business premises would also ring at another chauffeur agency which would handle the call if Denmark did not respond. This forwarding service assured Denmark of a continued patronage whether he was at the premises to personally respond to the call or not.
Defendant did not make proper or sufficient investigation before discontinuing service. The regulations warn that an on-premises inspection or such other means as are necessary, must be made to determine whether the facility has been abandoned. That a foreman was at the premises and saw the telephone does not by itself satisfy the requirement. In this case the foreman was sent to the premises to survey a job completely apart from plaintiff’s phone. He was not sent to the premises to determine whether plaintiff’s phone was abandoned, nor was he ever asked to make such an investigation. By his own testimony he never did make any investigation. Mundola did nothing more than relay an allegation made by York that it had not seen Denmark since February and note that the telephone was dusty.
While telephone companies are not insurers of service they are bound to exercise diligence in serving their customers, and where a telephone company has been furnishing service to a subscriber pursuant to his application and in accordance with the company’s rate schedules, and service is then disconnected, a prima facie case is made, and it is necessary for the company to justify the interruption in service. (Mortenson v New York Tel. Co., 32 NYS2d 488, mod on other grounds 179 Misc 289.) The telephone company has not in this instance justified the discontinuance. The mere statement that a phone was abandoned does not make it so. To disconnect a person’s telephone on a hearsay statement that the subscriber abandoned it after finding a recent payment, could only be termed a willful disregard of the subscriber’s rights.
The defendant would shield itself from responsibility by holding out its tariff, which states: "No liability shall attach to the Telephone Company for damages arising from errors, mistakes, omissions, interruptions, or delays of the Telephone Company, its agents, servants or employees, in the course of establishing, furnishing, rearranging, moving, terminating, or changing the service or facilities in the absence of gross negligence or willful misconduct.”
*209 While it is true that telephone companies may make and enforce reasonable rules and regulations under which their services are to be furnished, a rule not in accord with law is invalid. And though defendant maintains the law is settled that its exculpatory clause is enforceable, language in case law indicates that the exemption’s legality remains an open question.
In a recent small claims decision Lee v Consolidated Edison Co. of N. Y. (95 Misc 2d 120, 123) arising from the blackout of July, 1977, Judge Altman stated "the impact of such an exemption [the exculpatory clause] demands that its validity be seriously questioned. An examination of the applicable law leads me to the conclusion that the public policy and law of this State require rejection of Con Ed’s exculpatory provision as a defense in the case before me.” She found that New York courts do not favor contractual exemptions from liability for negligence.
Earlier cases also find exemptions from liability void as against public policy, particularly in the case of public utilities. In Boll v Sharp & Dohme (200 Misc 1104, 1105, revd on other grounds 281 App Div 568, affd 307 NY 646) the court held "where the relationship involves a public service it is against public policy for the public service to exempt itself from liability * * * The basis for this rule is that the parties are on unequal footing.” And in Emery v Rochester Tel. Corp. (156 Misc 562, 563) the decision, in part read: "The exemption in the contract, relied upon by defendant, is against the public policy of the State, and therefore, illegal and void. (Straus & Co. v. Canadian Pac. Ry. Co., 254 N. Y. 407, 414.) In that case the court said: 'The progressive enactments of the Legislature * * * have been so pronounced * * * that there can be no doubt that it has deliberately reached the conclusion, contrary to the early decisions, that to allow public service corporations by contract to absolutely exempt themselves from liability for negligence, is opposed to the best interest of the citizens of the State.’ This decision is in harmony with the principle of law as set forth in The Restatement of the Law, as follows: A contract for exemption from liability for the consequences of negligence is illegal if 'one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.’ (Restatement, Contracts, § 575, 1-b.)”
*210 In cases where liability for negligence is limited by contract the pivotal factor is the relationship of the parties to the contract. While the legal duty to use reasonable care may be limited or eliminated by contract, it may not be abolished by unilateral say-so. (Cohen v City of New York, 190 Misc 901.) In the defendant’s memorandum many cases cited in support of the limitation were cases where the plaintiff could have applied for a contract providing greater protection, as in Weld v Postal Telegraph-Cable Co. (199 NY 88) and Bissel v New York Cent. R. R. Co. (25 NY 442).
In the case of telephone service, the consumer is confronted with a contract of adhesion which makes no provision whereby a subscriber may purchase additional protection against negligence, and because of this, a limitation on liability is invalid.
The defendant tries to persuade the court of the limitation’s validity citing cases like Hamilton Employment Serv. v New York Tel. Co. (253 NY 468), involving an error in a directory listing, and Babitt v New York Tel Co. (63 Misc 2d 883), involving an error in transposing a digit of a phone number. Although the exculpatory clauses were upheld, these cases are not on point since they center on activities which are merely subordinate functions of the telephone company.
In Weld v Postal Telegraph-Cable Co. (199 NY 88, 98, supra) the precise language the defendant cites in its memorandum, supports the theory that limitations on liability are to be sustained only under exacting situations. Circumstances in which the company has no control as "atmospheric and physical disturbances which may set at naught the greatest care and skill” and for "such mistakes of their employees [of peculiar skill] as will occur * * * in spite of the most stringent regulations or the most vigilant general oversight.” Denmark’s service was not ended by an atmospheric or physical disturbance. Nor was it the result of a mistake by an employee in the performance of his specialized skill. It was a thoughtless blunder and wanton disregard of plaintiff’s rights. The court in Weld (supra, p 98) continues with the admonition that "this power [to limit liability] cannot be extended further without placing the public absolutely at the mercy of those engaged in transmitting telegraphic messages * * * They may protect themselves by contractual limitations that are reasonable, but beyond that they may not go.”
Although this court would invalidate the controversial ex *211 culpatory clause and hold the defendant to the less strict standard of care, this case may be disposed of on more solid ground. An examination of the facts as unfolded at trial demands a finding of gross negligence on the part of the defendant.
Gross negligence is a " 'thoughtless disregard of consequences without any attempt to avoid them’ ”. (Hazzard v Chase Nat. Bank of City of N. Y., 159 Misc 57, 69.) Or, " 'disregard of the consequences which may ensue from the act, and indifference to the rights of others.’ ” (Matter of Jenson v Fletcher, 277 App Div 454, 457-458, affd 303 NY 639.) As the term applies to the various cases, it implies willful misconduct or the intentional performance or omission of an act with a disregard of the probable consequences.
In the case at bar, service disconnection was controlled directly by the telephone company. The first agent of defendant involved with the termination was the installation foreman. Mundola, from an inspection of the premises, was aware, or should have been aware, that Denmark was in the business of providing limousine service. Consequentially he was alerted that Denmark’s phone was an integral part of this revenue-producing venture. Upon seeing a "dusty” phone and the allegation of York that Denmark "hasn’t been around”, Mundola called in for a disconnect. The business office supervisor pulled Denmark’s account which showed a payment had been made that month.
With no evidence to contradict the usual assumption that payment meant Denmark wanted his service to continue, without any further inquiry or any attempt to contact Denmark as required by the regulations, with total indifference to Denmark’s property right to his telephone service, with a thoughtless disregard of the consequence to Denmark of a disconnected telephone and without any attempt to avoid those consequences, and in total neglect of its obligation to make sure the phone had in fact been abandoned, termination of plaintiff’s telephone service was authorized. This action, or more accurately inaction, on the part of New York Telephone Company was clearly gross negligence.
Albert Schweitzer once cautioned that "the evils of a technology are exactly equal to the tolerance of the people.” This case illustrates the technology’s disregard for the property and rights of the people it serves. It is encumbent upon the court to ensure that the "monopoly” on telephone communications *212 possessed by the defendant is not used as a license for social irresponsibility.
Accordingly, the court finds for the plaintiff in the sum of $300.